**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO.: 1:21-cv-21286-XXXX**

Seventh Chakra Films, LLC,

      Plaintiff,

v.

Francesca Alesse,

      Defendant,

_____/

**COMPLAINT**
(Declaratory Relief, Copyright Infringement, Fraudulent Inducement, Civil Theft)

**Introduction**

1.      Plaintiff Seventh Chakra Films, LLC ("Company" or "7th Chakra") produced a documentary feature film *1986: The Act* ("Film") completed in June 2020. Andrew Wakefield ("Owner"), on behalf of the Company and as its sole owner and shareholder, hired Defendant, Francesca Alesse ("Alesse"), as a photographer, editor, administrative assistant and scheduler, including performing a host of other assigned tasks.

2.      Alesse was terminated effective January 1, 2020. She provided no additional services after October 22, 2019. The reasons for her termination on December 29, 2019, were due to incompetence and qualifications in editing which caused unreasonable delay and risked loss of the entire Film. Following her termination, Alesse refused to return $35,776.04 of company property, and falsely claimed a copyright interest in the Film, and is attempting to extort a settlement. She filed a fraudulent copyright registration on February 20, 2020, and a meritless suit in Florida state court on June 23, 2020, to enforce her nonexistent copyright claim by demanding

1

50% of the proceeds from the Film. The court dismissed the suit due to preemption of federal jurisdiction over copyright claims under 28 U.S.C. 1338(a). Her amended complaint was dismissed on March 16, 2021, because it failed to state a valid cause of action.

3.  On March 26, 2021, she threatened to file a complaint in federal court funded by Andrew Wakefield's "enemies," and demanded a settlement. Despite three demands, she still refuses to return the stolen Company property. This action seeks a declaration that the Company is the sole owner of the copyright in the Film, and damages (including costs and fees) for copyright infringement, fraudulent inducement, interference with prospective advantage, malicious prosecution, and civil theft.

## Jurisdiction and Venue

4.  The Company seeks damages for copyright infringement, fraud, breach of contract, and civil theft. This Court has jurisdiction under 28 U.S.C. § 1331 (federal question), 1338(a) (copyright infringement), and 1367 (supplemental jurisdiction over state claims).

5.  Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) and (b)(2) because Alesse resides in this District and because a substantial portion of the actions giving rise to these claims took place in the District.

## Parties

6.  The Company is a corporation organized in Texas in 2016, with its principal place of business at times in Ocala and Miami, Florida. Its principal business is the financing, production, distribution, and marketing of feature and documentary films. The Owner is the founder and sole shareholder of the Company.

7.  Francesca Alesse resides in Miami. The Company hired Alesse September 2018 to perform camera work, general office duties, and editing services. Alesse represented to Wakefield

that she had special competence in the use of the Avid Media Composer editing software based on her work in New York for ABC News.

8.      Prior to being hired by the Company to work on the Film, Alesse was a salaried employee previously hired to work with Wakefield at the Autism Media Channel LLC. She was employed to work at the sole direction and supervision of Wakefield to light, film, and audio record interviews for the Film, including filming in Italy. She was also employed to edit the Film based upon her representation to Wakefield that she was sufficiently and especially skilled in the Avid software-editing program.

## Factual Background

### Early Preparation

9.      In 2017, Wakefield contacted Alesse to discuss hiring her to work on the Film. She had previously performed some camera work and editing on a prior project for Wakefield while he was a partner at Autism Media Channel (AMC). In fact, Alesse was working for Wakefield at AMC in the prior months leading up to her employment by the Company in September 2018.

10.     She was paid a salary of $7,000 per month plus expense reimbursement. Although she was a full-time employee, as a start-up the Company paid all employees via 1099s. She was provided with the employee benefit of expense reimbursement, equipment, and a studio.

11.     Alesse performed a variety of office and "on location" duties as assigned by Wakefield, including arranging travel (booking flights, hotels, and car rentals), arranging interviews, camera work, and recording audio.

12.     Alesse did none of the factual and legal research relating to the subject matter of the Film, nor was she hired for or requested to conduct any of the interviews that formed the substance of the Film. Any efforts by Alesse to participate in interviews were solely of her own

volition and was not part of her job description.  Nor was any footage depicting her included in the film. Likewise, she also did not write or edit any portion of the screenplay. All interviews were solicited, prepared, conducted, transcribed, and edited on paper by Wakefield for inclusion in successive drafts of the screenplay for which, at all times, he was the sole author. All decisions as to what constituted relevant interview content were made by Wakefield. Whatever comments Alesse added were of her own choice and were not sought, requested, or utilized by Wakefield.

13.     In 2019, when traveling to Italy, Alesse did film B-roll at Wakefield's request. Any additional tasks or footage she performed or recorded in Italy outside of filming B-roll were of her own accord and not included in the Film.

14.     Alesse was paid a salary for full-time employment but not with a full and traditional employee benefits package because the Company is a startup company, originally with just two employees. Alesse was provided with expense reimbursement for her apartment used as a production and editing studio and with equipment, including computers, cameras, monitors, external hard drives, lighting and sound equipment, and accessories to perform the tasks requested of her.

15.     She did not work under her own independent creative control and had no control over her schedule for this Film. She carried out assigned tasks under the direction and control of Wakefield. She did not have her own editing studio but used one of the rooms in an apartment paid for by the Company.

**Alesse Drafted But Did Not Sign Written Contract**

16.     Alesse moved to Miami on July 1, 2018. She was not required to relocate in order to perform her duties on the Film and could have, had she chosen to do so, continued her work as a stringer for ABC News in New York.

17.     Alesse drafted a written contract titled "Contract of Service Provision" in early November 2018. Three drafts with edits were exchanged between Alesse and Wakefield between November 2018 and June 2019. In all three drafts, section 6.1 Responsibilities of the Contractor, states the copyright belongs solely to Wakefield as "Contractor":

6.1. Responsibilities of CONTRACTOR
Andrew Wakefield is both DIRECTOR of THE ACT and CONTRACTOR since he is currently the sole proprietor of Seventh Chakra Films LLC. <u>CONTRACTOR has been responsible for conceptualizing, formulating, and writing THE ACT and as such, is owner of the intellectual property and copyright on THE ACT.</u> CONTRACTOR has been responsible for using his resources and contacts of the last 25 years to recruit to the production and interview the all principal characters that will appear in THE ACT. CONTRACTOR has been responsible for conducting and transcribing the interviews of these principal characters for the purpose of reviewing and editing the narrative of THE ACT. CONTRACTOR has been responsible for raising the capital necessary to create THE ACT and takes responsibility for continuing to do so. CONTRACTOR will have responsibility for oversight over all legal aspects of THE ACT including but not limited to all contractual matters and obtaining legal clearance on Fair Use, and Errors and Omissions Insurance. As the financier of THE ACT, CONTRACTOR has responsibility for oversight and final decision-making rights over all aspects of production, post-production, marketing, and distribution of THE ACT.

(Emphasis added)

18. Moreover, Section 10 in all three drafts states the copyright belongs solely to Contractor:

**10. Representations; Warranties; Indemnities.** The parties represent, warrant and agree that: (a) there are no agreements or arrangements, whether written or oral, which would be breached by reason of the execution of this Agreement or the performance of its terms; and (b) each party has and will continue to have the full right, power and authority to enter into this Agreement and perform the terms and conditions hereof. CONTRACTOR and ARTIST further represent that: <u>(a) the Material was written solely by and is original with CONTRACTOR</u>; (b) neither the Material nor any element thereof infringes upon any other literary property; (c) to the best of CONTRACTOR's and ARTIST'S knowledge or that which CONTRACTOR and/or ARTIST should have known in the exercise of reasonable prudence, the production or exploitation of any television series or other production based on the Material will not violate the rights of privacy of any person, nor will production or exploitation of any television series or other production based thereon in any other way violate or infringe upon the rights of any person; and (d) the Material has not been previously exploited as a motion picture, television production, play or otherwise, and no rights have been granted to any third parties to do so. Each party agrees that such party

> shall indemnify and hold the other and any person or entity claiming under or through the other harmless against all claims, losses, damages, liabilities, costs and expenses (including, without limitation, reasonable outside attorney's fees and expenses) arising out of, or resulting from any material breach by the indemnifying party of this Agreement, including, without limitation, any breach of such party's warranties or representations under this Agreement.

(Emphasis added).

18.     Alesse drafted the sections disavowing any claim in copyright or ownership, and at no time during the editing process was that section modified in any way by either party. Final edits proposed by Wakefield were never revised, executed, or discussed further. Her draft provided for no authorship, ownership, partnership, or copyright from the beginning and remained so through to the final draft for which Alesse never made any comment, edit or modification. Wakefield retained copyright throughout all three drafts. Wakefield did not offer any ownership or copyright to Alesse at any time. At no time during the editing process or in the body of each email does Alesse challenge any copyright or authorship issue.

19.     If Alesse had any actual or legitimate claim to copyrights in the Film, as drafter of the agreement, she would have objected at some point in the editing process, which spanned six months. Alesse never stated that her reason for not signing the contract had anything to do with copyright, and at no time did she ever question Wakefield -- either orally or in writing -- about obtaining any ownership of copyright. These drafts, though never signed, demonstrate parties' intent was always for Alesse to have no claim to the copyright in the Film.

20.     Regarding compensation for full-time employment (40 hours per week, 6.2.iv), Alesse's draft provided for a monthly salary of $7000 (¶ 5, deferred when funding was unavailable), for an unspecified bonus, and for the end-credits title of Producer. Paragraph 6.2.iii also granted Alesse the exclusive right to several titles in the credits: "Principal (First Named) Producer, Principal Editor, Principal Director of Photography, and Principal Camera Operator."

21.   Paragraph 2 provided: "This Agreement does not constitute a joint venture or partnership of any kind among the parties, it being understood and agreed that the relationship among the parties hereto is one of independent contractors." Wakefield's comment in the draft margin of the document dated November 8, 2018, agreed: "This accurately describes our status. Seventh Chakra is contracting and paying for your services."

22.   Paragraph 3 acknowledged that The Act "is the intellectual property of Andrew Wakefield, currently sole proprietor of Seventh Chakra Films LLC, a film production company."

23.   The only reference to payments out of profits (¶ 5) provided for deferred salary and for an unspecified bonus but not for any ownership interest.

24.   Paragraph 6.2 (Responsibilities of Artist) stated that the "technical aspects of editing" were within Alesse's skill but that other post-production activities (e.g. motion graphics, sound correction) could be contracted to third parties.

25.   Paragraph 6.2.i further explained that her duties as an employee could be expanded at any time:

> "[t]he number and nature of the duties performed by ARTIST may vary from time to time. All variations will be by agreement between ARTIST and CONTRACTOR and will fall with the remit of this contract." Paragraph 6.1.ii provided that Alesse was also responsible for various routine administrative tasks: "[t]here will be additional administrative responsibilities that fall to ARTIST including but not limited to booking flights and hotel accommodation, obtaining clearances and permissions, negotiations with third parties, and obtaining releases from interviewees and other Talent."

**Pre-Production**

26.   Wakefield spent approximately 4 years creating the screenplay, which was a constantly evolving work-in-progress right up to the date the completed Film was first premiered, July 10, 2020.

27.     The steps necessary to research, organize, and create the Film's screenplay are set out below. Much of this work was accomplished before any interviews were recorded on camera. Alesse took no part in any of this vital preparatory work.

28.     Alesse played no part in the creative process leading to the Film, and in no way could be characterized as a collaborator or engaging in a collaborative process. She performed the technical and administrative tasks assigned to her as an employee.

29.     The Film examines a complex and highly controversial statute that has been subject to extensive analysis in the academic legal literature, the courts (including the Supreme Court of the United States), and popular literature. Wakefield began his process of creating the Film in 2016, supplementing his existing knowledge of the statute by reading and analyzing hundreds of documents, including academic articles, legislative histories and hearings, and court filings.

30.     All these documents were available to Alesse during her employment but as far as Wakefield is aware, she did not review, summarize, or analyze any of these materials, nor was she tasked to perform any such review by Wakefield.

31.     Wakefield's next task in shaping the narrative of the story was to identify and consult with experts in science and law, and authors of relevant legal and scientific papers, reviews, and commentaries that had been part of his background investigation and research.

32.     Alesse took no part in these discussions, nor was she asked to play any such role by Wakefield.

33.     Wakefield's next task was to distill his investigation and the accumulated information into a draft outline as a template for the movie screenplay. This involved multiple iterations of the storyline, which, in due course, was assimilated into the screenplay for the Film.

In the early stages of the Film, Wakefield worked alone. Alesse took no part in this process, since Wakefield began work on the Film in 2014.

34.     Alesse was initially hired to run cameras while Wakefield conducted interviews. As the project progressed, Alesse expressed an interest in editing. Except for the occasional administrative task associated with filming, Alesse was hired as an employee to work on the Film but only in production, as was the case from day one.

35.     The majority of the interviews were of leading experts in aspects of vaccine law and advocacy. Many had published books and/or academic texts on the subject. Preparation for each interview involved reading this literature and formulating a series of individualized questions. Alesse performed none of this work, nor was she asked to by Wakefield. Alesse occasionally asked ad hoc questions of the interviewee at the end of the formal interviews by Wakefield, but no footage of Alesse's questions or the interviewee's responses to her questions were included in the Film.

36.     Wakefield conducted the interviews. Alesse filmed and recorded the sound for many of these interviews. For certain interviews, Wakefield conducted these and filmed them alone, other interviews were filmed by the principal cinematographer Sam Painter in Los Angeles.

37.     Wakefield transcribed all of the interviews and incorporated them into the evolving screenplay. Alesse played no part in this process.

38.     Wakefield was wholly responsible for creating the screenplay for the Film. Alesse was first provided with a full-length draft screenplay in May or June, 2019 and instructed, as the then-editor, to cut the "A-Roll" of the movie exactly as it was set out in the screenplay. The "A-Roll" at this stage consisted of the story told through the interviews with experts, advocates, and parents. This task did not allow for creative revisions of the screenplay by Alesse. Alesse's creative

input into the storyline and dialogue was neither sought nor wanted. Her job was simply to follow Wakefield's instructions. Any suggestions Alesse made during the editing or filming processes were a part of the standard duties and job description of a cinematographer.

**Use of the Fictional Pregnant Couple as Continuity Element**

39.     Alesse's copyright theory is based on her core claim to have "conceived the idea of having a fictional couple bearing a child as the central thread for the narrative of the Film." She swore, in her verified state-court motion for injunctive relief, that using the pregnant couple to tie the interviews together into a coherent story was hers alone and that she got this idea in August 2019.

40.     This claim by Alesse is categorically false.

41.     Wakefield had developed the idea for the use of a fictional couple as the continuity element to tie the interviews together as a narrative device. Wakefield's inspiration came directly from his private meeting with a celebrity couple who were eager to support Wakefield's Film and at one point were considered as the actual Actors for the Film (denominated J1 and J2 in the original script). Alesse played no part in this process and was unaware of the meeting at the time.

42.     In May 2019, Wakefield discussed the narrative device with a handful of trusted confidants (not Alesse) including Lori Martin Gregory, now CEO of the Company, at the Autism One conference in Chicago on May 23-26, 2019. Wakefield advised Alesse in writing on June 16, 2019, that he had devised a narrative solution, and included the couple in his June 21, 2019, draft screenplay, months before August of that same year, when Alesse claims to have come up with the idea.

43.     Wakefield continued to write developing dialogue into the screenplay during May and June and provided a draft to his colleague and Principal Cinematographer Sam Painter on July 21, 2019.

44.     Alesse would later falsely claim in her state-court Complaint and verified motion for injunction that the couple was her idea. She claimed in an amended state-court pleading that "the pair [i.e., Alesse and Wakefield] conceived the idea of having a fictional bearing of a child as the central thread for the narrative of the Film." See First Amended Complaint at ¶7.

**Late-Stage Production**

45.     On September 6-8, 2019, certain filming took place in a mock courtroom in the law office of Bill Allen in Ocala, FL. The location, costumes, set design and the actors were all completed and sourced by Lori Martin Gregory. The actors were prepared by Wakefield, who provided the screenplay and directed the shoot.

46.     Alesse was only responsible for filming and sound recording.

47.     Increasing friction between Alesse and other members of the team was becoming more and more evident. Her unprofessional performance on this location shoot included forgetting to bring essential lighting equipment, numerous cigarette and coffee breaks, breaking equipment, spilling coffee in the middle of the set just before the shooting was to begin, and an incomprehensive knowledge of how to use some of the monitors. But for lighting equipment borrowed from a local church, a day of work would have been lost.

48.     On October 4-13, 2019, in Topanga Canyon, CA, most of the footage of the fictional couple, whose roles Wakefield had by then incorporated into the script, was shot. Lori Martin Gregory secured the two actors who were rehearsed in El Paso, TX, by Wakefield. The Principal Cinematographer on this shoot was again Sam Painter. The friction issues were

increasing with Alesse. When her suggestions were rejected or those of others preferred, she would sulk and complain.

49.     Another location shoot took place at the Kraine Theater in New York on August 10, 2019. Here Alesse made a critical mistake in filming the interview of one of the principal interviewees, David Kirby. This involved "crossing the line" such that in a two-camera shoot the interviewee appeared to be looking in a different direction when cutting between camera shots. This was an error that should have been avoided based on her claimed level of production experience.

**Alesse's Negligent Editing**

50.     Wakefield, in various projects and in his roles affiliated with various companies, has hired over the past seven years and worked alongside many skilled editors on his previous two movies and countless video projects. On behalf of the Company, Wakefield hired Alesse in material part because of her claimed special expertise in the use of Avid Media Composer software from her seven years working at ABC News and Al Jazeera. She claimed to have won an Emmy for her editing at ABC News.

51.     Unfortunately, by October 22, 2019, Wakefield realized Alesse was experiencing serious technical difficulties with her editing. He contacted the Company's CEO, Lori Martin Gregory, to explain the Film was in jeopardy and asked her to start sourcing technical experts to define the problem and provide a solution. Gregory mentioned her brother Brenden Martin, and his production team at Brick City Creative, in Ocala, Florida, as a potential source for the necessary skill set.

52.     Wakefield first became concerned when Alesse tried to output an edited sequence for him to review, which contained clips of footage from various different files and folders. Error

messages would often display on screen saying, "MEDIA OFFLINE," meaning Wakefield could not view Alesse's work.

53.     The Avid software could not locate the source media, making it impossible to view the edited sequence of footage. However, the software provided no indication of why clips of footage that should be "ONLINE" could not be found in the source files.

54.     The problem of the software's inability to locate and properly handle media files was particularly acute when creating a "backup" drive, an essential process to protect the assets in video editing, should the "working" drive be compromised in some way. Any attempt to create a backup drive that could be read without important media being "offline" was a failure.

55.     In addition, the Mac computer provided to Alesse by the Company kept "crashing." This is often an indication that it is being asked to do something that requires processing power beyond its capacity. Editing the Film in Avid should not have been beyond the capability of or "stressful" to the hardware or software, as the task of assembling a lengthy film or video project from a huge mass of underlying clips was precisely its designed task.

56.     Alesse was unable to provide an explanation for these problems and was unable to resolve them. By October 22, this was a continuous, ongoing, regular occurrence, which halted the entire editing of the Film.

57.     Based on Ms. Gregory's recommendation after his call to her on October 22, Wakefield consulted with Brenden Martin and his team at Brick City Creative in Ocala, Florida.

58.     Wakefield asked Martin to come to Miami on or around November 12, 2019, at the Company's Miami office to interview him and establish his credentials. Wakefield asked him for his professional thoughts on the recurring problems with Avid Media Composer repeatedly

returning the message "MEDIA OFFLINE." Martin then went alone to a prearranged meeting with

Alesse.

59.    The details of this meeting between Martin and Alesse are set out in the unedited,

uncorrected statement of Martin below dated February 4, 2020. This statement was prepared at

Wakefield's request.

> [BM] I was hired by 7 Chakra Films to come and work on the movie 1986:The Act as a b-roll and post-production finishing specialist. I was asked to come to Miami and meet with then lead editor Francesca Alesse to get an update on where the film was in the post-production process and how I could assist in moving the film to the next level of editing by adding the b-roll and animation assets to the current version of the film. Upon arriving at Francesca's apartment in Miami, FL I went immediately to her editing room and was given a brief summary of what she had completed and what she needed from me as a 2nd editor.

> Francesca was very standoffish about me looking at the current timeline and project she had created in Avid Media Composer. Andy Wakefield, the filmmaker, and EP [Executive Producer] of the film had tasked Francesca with exporting the current sequences and uploading them to Vimeo.com so he and others could assess the current status and make the necessary changes. This is not a standard operating procedure in my experience thus I asked Francesca why Andy was not editing alongside her. She expressed her disdain for editing during the times he wanted to work stating that she liked to work late at nights and hated waking up the mornings when Andy preferred to edit.

> She also seemed to be hiding something from [**me**] because she would not let me access the current edit to look at what she had already [sic] accomplished. She in fact requested that we leave the editing room in her apartment and head to a lengthy late lunch where she seemed to be stalling even more. When I asked questions about the editing process she acted as if there was something wrong with the way Andy wanted her to continue.

> After we finished at the restaurant we went back to her apartment and I continued to press about possibly getting some work done on the current part of the timeline she was editing at the moment. It was then I began to see some of the potential issues. She was seemingly hiding from me and when she went to smoke a cigarette I stayed behind and was able to see that she [was] struggling with reconnecting the media from several different hard drives back into Avid Media Composer and the film.

> When she returned from her smoke I asked her about the files that were registering Missing Media and pressed about what the potential issue could be and what we

could do to remedy such issues because it was several files in the timeline that was not reconnecting. When I asked her about the issue she only responded in the negative and began to complain about the style and requests that Andy Wakefield was asking her to do stating that his lack of knowledge in the post-production process was the reason for the issues and the missing media. She said "He wants what he wants and does not understand we can't use different types of media" going on to say she had told him of such issues and she stated he does not seem to care or understand her issues. Being new [to] the project and new to the personalities I didn't press on or ask anymore probing questions but Francesca felt the need to keep talking. She was clearly upset about something but would not tell what it was. When I asked if she was still enjoying working on this project she just responded in the negative saying Andy and his "Super Model" girlfriend were annoying and that I should reconsider even working on the project.

I was taken back by her comments since I was very excited to be working on the film so in my need to understand more I began to inquire about the raw files on the existing hard drives. I asked her if she had all the raws [footage] or did Andy keep the files or a backup of the files in his possession. It was then she stated that he was not smart enough to keep his raw files or his camera equipment at his apartment and that she kept all these items in her apartment. I made a joke about her having all the power and she looked at me seriously and said that if Andy ever tried to remove her from the film she would destroy his master drive and all his files and she would make sure there would never be a film to edit. I as I tried to make a joke about it I knew there was something very wrong in the project and that Andy needed to be informed of the issue. I found it concerning that she seemed to be very serious about using the assets as leverage and thus I, upon leaving her apartment, contacted Andy about what I heard and how I found it to be very troubling.

I was able to get the raw files and the Avid Media project back to my studios in Ocala FL. Once the project files opened and on my version of Avid Media Composer I was not able to open the project file and work on the film. After about a month of trying to remedy these issues and contacting Avid supports and several local Avid editors I was stumped and realized what had occurred. She was lost in her edits and was attempting to use several different hard drives which is a novice move on the post-production process. Please reference our letter from Taylor and me for further tech details.

60.    Once back in Ocala, Martin and his team were able to consult with 11 Avid experts -- including Orion Media and Dillon Studios -- some of whom provide high-level Avid editing services for major studios in Los Angeles. Their expert opinions were that the project was such a mess, when asked for a quote to fix it they said either "we won't touch it" or "it's beyond repair."

61.     Martin subsequently sought advice from Taylor Michel, a colleague and media expert who was able to confirm after running several diagnostic tests, that Alesse had been unnecessarily creating multiple duplicate files and folders with each edit, resulting in a logjam within Avid that halted function. An analysis of the media files on the hard drive and the edited sequences revealed that improper use of Avid created so many duplicates (one folder for example contained 4,624 duplicates) that the software was in effect searching for a "needle in a haystack" every time the Film's project was opened and was "choking" on the sheer volume of unnecessarily duplicative content.

62.     Taylor Michel provided a thorough, preliminary analysis of the laborious efforts he and Martin made in an attempt to recover the Film, in a December email to Wakefield. In this preliminary analysis, Michel determined the following:

> i.     "Our conclusion is that we still are missing media files that exist on some other drive (most likely the internal drive of the Mac that you are using), and this is causing issues in Avid because it doesn't know where the files are. Also, the project seems like it was duplicated several times on the drive before we received it, which has resulted in the project being much larger than it needs to be as there is only about 6TB of raw media for the entire project (We were given 12TB of project files & data)."

63.     In February 2020, Michel & Martin completed their final analysis and again concluded that the Alesse version of the "edited" film could not be salvaged. All of these efforts to retain the Avid "edited" version of the Film were unsuccessful. Michel concluded that the files were either corrupted or missing, that the Alesse version could not be recovered, and that editing would have to begin from scratch.

64.     These professional assessments were a godsend to the project, without which Wakefield would have lost his entire film and four years' work. The cost in time, resources, and hard work were nearly wasted because of Alesse's failure to acknowledge her shortcomings. The

massive misuse of the technology, creation of a logjam which resulted in the pressure of a needle-in-a-haystack work environment, combined with Wakefield's own concerns regarding Alesse's professional demeanor, were more than enough reason to remove her from the editing of the Film.

65.     While Alesse may have been able to view some of her "edit" on the computer and external hard drive arrangement she was using in her apartment, any attempt to back up the footage and the "edited" files that comprised the then-current version of the Film to another drive was impossible.

66.     Alesse's incompetence meant that the entire Film was compromised and irreparable in Avid Media Composer. Had Wakefield not brought Martin and his team in to troubleshoot this problem, at considerable cost to the Company both in terms of time and money, the Film would have been lost.

67.     Based upon expert consultation with highly experienced editors working exclusively in Avid Media Composer, and extensive analysis of the hard drive and the media files, Wakefield concluded that the Film, as "edited" by Alesse was completely unworkable.

68.     At this stage, Wakefield decided to scrap Alesse's edit and start the edit from scratch.

**Re-Editing the Film**

69.     The original schedule was to finish the Film by the end of December 2019. The failed "edit" by Alesse had to be completely discarded, and the entire editing process restarted from scratch using Adobe Premiere Pro software, with which the team at Brick City Creative and the new in-house editor Claire Dooley (who went on to become the Film's principal editor) were far more familiar. Alesse was not familiar with Adobe Premiere Pro and was demonstrably not competent to participate in the editing of the Film in Adobe or any other movie editing software.

17

70.     As a result of the delays due to Alesse's incompetence, the Film was finally completed at the end of June 2020. The delay, expert analysis, and re-edit cost the Company an estimated $150,000.

71.     The Film was completed on or about July 1, 2020.

72.     A traditional theatrical release was impossible, due to the Covid-19 pandemic. The Act was shown on Seventh Chakra's streaming service and on other streaming platforms beginning on July 10, 2020.

73.     The Registrar of Copyrights issued Seventh Chakra a certificate of registration for the Film, No. PA0002264550, on August 8, 2020, and for the screenplay, No. PAu004028880, on May 11, 2020. The author and sole copyright holder on the Film is 7th Chakra; the author and sole copyright holder on the screenplay is Wakefield, who has granted rights and permissions to the Company.

**Termination of Alesse, Theft of Company Property, and Attempted Extortion**

74.     Wakefield terminated Alesse in a December 29, 2019, email and asked for the immediate return of the Company's equipment and additional digital content assets then located at her apartment. Some of this additional footage included interviews that had not yet been added into the edited sequences but were deemed essential for the Film.

75.     Wakefield has tried without success on numerous occasions to recover the stolen footage and camera equipment from Alesse:

STOLEN EQUIPMENT

| Item | Cost |
|---|---|
| Canon C300 Camera | $7,500 (replacement cost) |
| Teleprompter | Glide Gear TMP100<br>Order# 112-6041865-4103417<br>$213.04 |
| Lights LED panel | Falcon Eyes RX-18T<br><br>$263.00 (original no longer available) |
| Lenses | Details unknown |
| Camera Cases | Hard Travel Case for Canon C300 Mark II<br>Camera<br>$600 |
| Tripods | Details not known |
| Accessories (CFAST Data Cards, cables etc, batteries, chargers) | Details not known |
| Computer iMac Pro | New Apple iMac Pro (27-inch, 32GB RAM, 1TB<br>SSD Storage)<br>$5,000 |
| Hard Drives | Estimate $2,000 |
| Monitor | Samsung LC27F398FWNXZA Samsung C27F398<br>27 Inch Curved LED Monitor<br>$200.00 |
| Footage (precise amount unknown)<br><br>AW wrote to FA on [date] specifically requesting the return of this footage to no avail. To my knowledge at the material time i.e. during editing, FA did not respond. | Estimated cost of obtaining such footage, including travel and accommodation, production time, etc and compromise to the movie due to absence of footage: $20,000.00 |

--

76.    For example in a February 1, 2020 email to Alesse, Wakefield explained:

I have received a letter from your attorney which I am in the process of dealing with. I would urge that, in the meantime, my materials, equipment etc are returned via Claire Dooley and not somehow held to ransom pending the resolution of your

legal position. In particular, B-roll from Mary Holland that we shot at NYU and Washington Square is missing. Please would you make this footage available to Claire Dooley as a matter of urgency. It is directly impacting the films completion with the inevitable expense that will be incurred.

77.     The footage referred to above ("Mary Holland") is one example of footage stolen by Alesse that was important to the Film but, in the end, had to be left out.

78.     Counsel for Alesse (her first lawyer), Allen Jacobi, falsely claimed an ownership interest and in a January 24, 2020, letter sought "a buyout of her copyright claim." Counsel for Seventh Chakra responded on February 9, 2020, again demanding return of the equipment and footage, and explaining that Alesse as an employee did not have any ownership or copyright interest.

79.     Counsel for Alesse responded on February 11, 2020, claiming Alesse was an independent contractor and that the 7th Chakra equipment and footage would remain a hostage pending settlement negotiations: "My client is planning to place the equipment in storage and we will let a court of law decide what is the best disposal of that equipment. My client has no interest in keeping any equipment but is extremely concerned over her damages and your client's complete denial to enter into negotiations."

80.     Counsel for 7th Chakra explained in a February 13 letter that under the Copyright statute, any contribution made by Alesse was a work made for hire, creating no copyright. 17 U.S.C. § 101 (defining "work made for hire" as a "work prepared by an employee within the scope of his or her employment." Alesse was an "at will" employee because she declined to sign Wakefield's final revisions.

81.     On February 2, 2020, Alesse registered a copyright for "The Act" (PAu004022925) claiming a copyright and co-authorship in the "entire motion picture."

82.    Alesse filed her copyright with the express purpose to tortiously interfere with 7th Chakra's ability to distribute and monetize the film.

**Alesse First Lawsuit**

83.    Alesse filed her state-court Complaint against Wakefield on June 23, 2020, claiming a 50% ownership interest in the Film. Count I sought a declaration that Alesse was the co-owner and co-author of the Film. Count II sought an accounting for 50% of the proceeds of the Film. Count III sought unspecified damages for breach of fiduciary duty. Count IV sought an injunction to restrain any further infringement. See *Alesse v. Wakefield*, No. 20-013277 CA 01 (Fla. Miami-Dade Cty. Ct., filed June 23, 2020).

84.    Among other objectively false allegations, Alesse claimed (¶ 12) that subsequent to August 2019, "the pair conceived the idea of having a fictional couple bearing a child as the central theme for the narrative of the Film" and that (¶ 20) she "she contributed original copyrightable elements to the [F]ilm as the collaborator of "Wakefield."

85.    The Complaint was dismissed without prejudice on January 7, 2021.

**Alesse First Amended Complaint**

86.    Alesse filed her state-court First Amended Complaint on January 19, 2001. She dropped all mention or claim of copyright. Count One sought damages for breach of an undated oral contract to "collaborate with Defendant on the creation of the Film. Alesse alleged that the contract included a provision that "as compensation therefore, Plaintiff would receive 50% of the proceeds derived from exploitation of the Film." Count Two sought an accounting. Count Three alleged a breach of fiduciary duty

87.     Alesse again alleged (¶ 12) the objectively false claim that she "gave [Wakefield] several ideas regarding potential thread concepts that would keep the narrative of the Film together. Subsequently, the pair conceived the idea of having a fictional couple bearing a child as the central thread for the narrative of the Film" and (¶ 20) that she "added original elements to the Film, as the collaborator of" Wakefield.

88.     Wakefield moved to dismiss on February 5, 2021, demonstrating that there was no oral contract and that, in any event, no such contract was enforceable under the Florida Statute of Frauds, F.S. § 725.01. The motion also demonstrated that no accounting was justified and that the relationship alleged by Alesse did not qualify as a fiduciary relationship under Florida law.

89.     The court held a Zoom hearing on March 16 and dismissed the First Amended Complaint, again without prejudice, for the reasons set forth in Wakefield's motion to dismiss. Alesse was granted leave to amend, but failed to amend within the time granted.

**Claims for Relief**

**Count 1 – Declaratory Judgment that 7th Chakra is Sole Owner of Copyright**

90.     7th Chakra alleges and incorporates the facts set forth above in paragraphs 9 to 89.

91.     7th Chakra hired Alesse to perform various technical and administrative tasks associated with production of the Film. She was terminated for cause on December 29, 2019, prior to completion of the Film, but was paid in full for her work. As an "at will" employee, all of her work on the Film was performed within the scope of her employment and was a "work made for hire" as defined in 17 U.S.C. § 101. Accordingly, she acquired no copyright or ownership interest in the Film, and 7th Chakra is the sole owner of the Film and copyright.

92.     Moreover, regardless of her employment status and regardless of whether her work is considered a work made for hire, Alesse's contributions to the Film were such that she is not an author or co-author of the Film under the Copyright Act.

93.     Despite this, Alesse claims a copyright interest and authorship in the Film.

94.     Thus, the parties are in doubt as to their rights or obligations concerning the Film and their copyright interest therein. As competing copyright claimants, the parties are of adverse legal interests. Their dispute is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

## Count 2 – Copyright Infringement

95.     7th Chakra alleges and incorporates the facts set forth above in paragraphs 9 to 89.

96.     As explained in detail above, 7th Chakra is the sole author of the Film, *1986: The Act*, and Alesse has no ownership or copyright interest in the Film, and any claim that she does is false and fraudulent.

97.     Alesse was an "at will" employee under the Copyright statute. Any contribution made by Alesse was a "work made for hire" creating no copyright. 17 U.S.C. § 101 (defining "work made for hire" as a "work prepared by an employee within the scope of his or her employment."

98.     Alesse was an "at will" employee because she declined to sign Wakefield's final revisions. Alesse had prepared a draft written contract, which went through several revisions with Wakefield. Each draft specifically disavowed any copyright interest. She declined to sign the final edits proposed by Wakefield but the issue of copyright (solely in 7th Chakra) was never in dispute.

99.     Alesse was employed to perform camera and editing work on the Film and to carry out office work and administrative tasks as assigned by Wakefield.

100.    Alesse was paid via a 1099 but this was an administrative convenience since 7th Chakra was a startup with only two employees. There were no indicia of independence under copyright law sufficient to create an inference or presumption that her work was anything other than a work for hire.

101.    Moreover, regardless of her employment status and regardless of whether her work is considered a work made for hire, Alesse's contributions to the Film were such that she is not an author or co-author of the Film under the Copyright Act.

102.    Alesse was paid a salary of $7,000 per month for full-time employment. She had no independence and performed tasks as assigned and supervised by Wakefield. She had no studio or equipment. These were provided by 7th Chakra. Although a traditional employee benefits package was not yet established by 7th Chakra, she was reimbursed for her expenses, which included travel, a studio for editing, equipment, and incidentals. None of her work, including editing, was in way separately commissioned requiring a separate written instrument signed by the parties.

103.    The location of her work was dictated by Wakefield. He assigned numerous administrative office and administrative tasks to Alesse in addition to her camera and editing work. All of Alesse's work was part of the regular business of 7th Chakra, i.e. the production of feature documentaries.

104.    7th Chakra registered the Film in the Copyright Office on August 8, 2020, No. PA0002264550, and registered the screenplay on May 11, 2020, No. PAu004028880. The Company deposited the works as required by law.

105.    Alesse infringed 7th Chakra's copyright by the following actions:

a. Filing a fraudulent application for copyright on February 20, 2020, No. PAu004022925, prior to the completion of the Film, claiming that she and Wakefield were co-authors, and depositing a work that was not the Film.

b. Filing a lawsuit in Florida state court, including verified motion for injunctive relief, *Alesse v. Wakefield*, No. 20-013277 CA 01 (Fla. Miami-Dade Cty. Ct., filed June 23, 2020), *dismissed* January 7, 2021, claiming a 50% interest in the proceeds from the Film based upon her false copyright.

c. Filing a First Amended Complaint on January 19, 2021, *dismissed* March 16, 2021, claiming an ownership interest in the Film based on an alleged oral contract.

106.    These infringing actions have damaged 7th Chakra by causing attorneys' fees and costs in excess of $160,000 (estimated as of April 1, 2020), and lost time and effort valued as of April 1, 2020, at $20,000.

107.    The infringement was committed willfully, thus entitling the Company to the maximum statutory damages of $150,000. For example, Alesse knew when she filed the state action that the idea to use the pregnant couple as the narrative element was not her original idea in August 2019, as she claimed in her complaint, because Wakefield had advised her in an email dated June 8, 2019, that it was his idea. She also knew that there was no oral contract including 50% ownership for her because she drafted (and exchanged several edits) a contract, which she ultimately never signed, specifically disavowing any ownership interest in the Film and any copyright and acknowledging that all copyright and all intellectual property belonged exclusively to the Company.

## Count 3 – Fraud in the Inducement – Misrepresentation of Qualifications

108.    7th Chakra alleges and incorporates the facts set forth above in paragraphs 9 to 89.

109.    Alesse falsely claimed that she had the technical proficiency and expertise to use the Avid Media Composer software to edit the Film, and concealed the material fact that she lacked such knowledge and expertise.

110.    Alesse falsely represented that "she" had won an Emmy Award for an ABC News broadcast, when in fact the Emmy was unrelated to her editing ability.

111.    Alesse intended for the Company to rely on these representations in deciding whether to engage her to work on the Film.

112.    The Company relied on these representations in hiring Alesse to edit the Film.

113.    As set forth above, beginning in approximately August 2019, Alesse attempted to edit the Film using the Avid software, but by the end of October was unable to produce a usable working draft copy of the Film. Expert analysis revealed, e.g., that the files were corrupted, that the computer was unable to process an overwhelming quantity of duplicates wrongly generated by Alesse, that the Film was near a complete loss, that the damage was irreparable, and that the editing process would have to begin from scratch.

114.    As a result of this fraud, 7th Chakra was damaged by reason of delay of several months in completing the Film, by the expense of several experts used to analyze the problems caused by Alesse, and attempt repair, and by the additional expense of beginning the edit process from scratch. These consequential and compensatory damages are estimated at $150,000.

115.    Alesse's wrongful conduct was intentional. She knew that Wakefield sought an editor with sufficient expertise in the use of Avid Media Composer to competently edit the Film. She was aware that the task of editing a Film was far more complex and difficult than the experience she had gained from editing short news clips. Not only did she deliberately conceal her lack of qualifications prior to hiring, but she concealed the growing problems she was having prior

to their eventual discovery by Wakefield on approximately October 22. She also actively concealed the extent of the damage when asked to cooperate with expert analysis between October and the end of December 2019.

116.    Alesse is also responsible for punitive damages because her conduct was grossly negligent. The Film was nearly lost because she failed to make adequate backups, failed to notify Wakefield once she realized the edit was in trouble, and failed to enlist the help of qualified and competent experts at an early reasonable opportunity.

## Count 4 – Civil Theft in Violation of F.S. 812.014

117.    7th Chakra alleges and incorporates the facts set forth above in paragraphs 9 to 89.

118.    As set forth above, Alesse stole video footage, a computer, monitors, external hard drives, cameras and many accessories owned by 7th Chakra that compromised the Company's ability to complete the Film. Ignoring several demands for the return of this Company property, Alesse retains this property in her home (as she admitted in her deposition taken in the state-court action).

119.    As a prerequisite required by law, Seventh Chakra demanded the return of this property in emails from Wakefield dated December 29, 2019, and February 1, 2021, and in letters from counsel dated February 13 and September 29, 2021.

120.    By exercising control and dominion over 7th Chakra's equipment and interview content, and refusing to return them after repeated demands, Alesse has committed civil theft in violation of Florida law. F.S. § 812.014(1)(a)-(b).

121.    Alesse stated in her deposition on or around October 28, 2020, that the equipment was located in a room within her residence.

122.    The equipment held by Alesse is valued at $15, 776.04 and the interview footage is valued at $20,000.

123.    Alesse is liable in damages under F.S. 772.11 for treble damages of equal to $107,328.12, plus costs and attorney fees, to be determined.

**Count 5 – Interference With Prospective Advantage / Advantageous Business Relationship**

124.    7th Chakra alleges and incorporates the facts set forth above in paragraphs 9 to 89.

125.    7th Chakra anticipated sale of the Film or a distribution and licensing agreement upon its completion in June 2020. Such arrangements are customary in the movie industry. Alesse was aware of this potential because she included provisions anticipating such sale or licensing in her November 2019 draft contract.

126.    Seventh Chakra was unable to negotiate a sale of its rights due to the cloud on copyright interposed by Alesse, her fraudulent registration, and her subsequent and threatened litigation.

127.    Accordingly, by reason of Alesse's intentional and unjust interference with Seventh Chakra's copyright, Seventh Chakra suffered loss of this valuable economic opportunity.

**Count 6 – Malicious Prosecution Based Upon Maintenance and Frivolousness**

128.    7th Chakra alleges and incorporates the facts set forth above in paragraphs 9 to 89.

129.    Counsel for Alesse advised Seventh Chakra in a March 26, 2021, email that she intends not to pursue her twice-dismissed claims in Florida state court and will file a copyright claim (and pendent state claims) in federal court. Counsel stated in the email: "Apparently, your client has a number of enemies who are willing to fund the litigation." Using such "enemies"

funding to support a meritless case is a crime under Florida law, F.S. § 877.01, and can be remedied here in an action for the tort of malicious prosecution.

130.    In addition to maintenance, Alesse committed malicious prosecution by bringing her case in Florida state court that was frivolous as a matter of both fact and law, and was brought for the purpose of harassment. Alesse brought the above-described case against Wakefield as the sole shareholder of 7th Chakra. She brought it initially making copyright claims despite federal courts having exclusive jurisdiction over copyright claims.

131.    Wakefield was the prevailing party by virtue of the court granting a motion to dismiss on March 16, 2021. Although Alesse was offered the option of filing a third complaint, she declined to do so. Alesse instigated her state case with malice and without probable cause in law and fact. Indeed, the facts known to Alesse demonstrated she had no case at all as a matter of fact and law. She made allegations in her verified motion for injunctive relief that were demonstrably false, such as the existence of a claimed oral contract granting her a 50% copyright interest and that she conceived the use of a pregnant couple as the narrative theme in August 2018, Wakefield having had the idea, and advised Alesse, in May 2018.

132.    7th Chakra has suffered estimated damage by reason of this unlawful maintenance and malicious prosecution of at least $160,000 as of April 1 (costs and fees in the defense of the Alesse litigation). This damage is ongoing.

## Demand for Jury Trial

133.    Seventh Chakra Films respectfully requests a jury trial as to all matters so triable.

## Relief Requested

134.    Plaintiff 7th Chakra respectfully requests the following relief:

a. A judgment that 7th Chakra is the sole holder of the copyright on the Film, *1986: The Act*.

b. A judgment prohibiting Alesse from claiming any interest in ownership revenue or profit from the Film.

c. A judgment requiring Alesse to cancel her copyright registration for the Film and perform all other acts necessary to ensure that records in the Copyright Office reflect that 7th Chakra is the sole owner of the copyright.

d. A judgment requiring Alesse to return the equipment and content stolen from the Company.

e. A judgment requiring Alesse to return (and certify destruction of) any copies of the Film and its screenplays in her possession.

f. A judgment awarding damages for fraud in the inducement.

g. A judgment awarding damages for grossly negligent editing.

h. A judgment awarding treble damages for civil theft of $107,328.12, under F.S. 772.11(1) plus costs and attorney fees, to be determined, under F.S. 722.11(1).

i. A judgment awarding damages for copyright infringement pursuant to 17 U.S.C. § 504(b) approximating (as of April 1), $160,000 to date (costs and attorney fees).

j. A judgment awarding copyright infringement statutory damages pursuant to 17 U.S.C. § 504(c)(1) of $30,000.

k. A judgment awarding maximum statutory damages for willful infringement of $150,000 pursuant to 15 U.S.C. § 504(c)(2).

l. A judgment awarding costs and fees in the instant case as part of the costs pursuant to 17 U.S.C. § 505, to be determined.

m.  An order requiring the disclosure of any funding of this case and prior state cases brought by Alesse (including amount and source), e.g., so that this Complaint may be added to add these funders as parties.

n.  A judgment awarding punitive damages as a result of this case (and prior state cases) being funded by "enemies" of Wakefield and being a malicious prosecution without basis in fact or law and filed for purposes of harassment.

o.  Grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

ALAN FERTEL, ESQ.
WEISS SEROTA HELFMAN
COLE & BIERMAN, P.L.
2525 PONCE DE LEON BOULEVARD SUITE 700
CORAL GABLES, FLORIDA 33134
PHONE NO. (305) 854-0800
FACSIMILE NO. (305) 854-2323

By:  __/s/ Alan K. Fertel____
     **Alan K. Fertel**
     Florida Bar No. 435066
     Primary e-mail address: afertel@wsh-law.com
     Secondary e-mail address: isevilla@wsh-law.com
     **Richard B. Rosengarten**
     Florida Bar No.0106169
     Primary e-mail address: rrosengarten@wsh-law.com
     Secondary e-mail address: szavala@wsh-law.com