UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO: 1:21-cv-21286

SEVENTH CHAKRA FILMS, LLC,

    Plaintiff,

v.

FRANCESCA ALESSE,

    Defendant.

_____/

## ANSWER, AFFIRMATIVE DEFENSES AND 1ST AMENDED COUNTERCLAIM

Defendant, FRANCESCA ALESSE, (hereinafter "Defendant"), by and through undersigned counsel, files her answer and affirmative defenses to Plaintiff, SEVENTH CHAKRA FILMS, LLC ("Plaintiff"), and counter sues as follows:

1. Denied.
2. Denied.
3. Denied.
4. Admit.
5. Admit.
6. No knowledge; therefore denied.
7. Admit, but not a complete statement of relevant facts.
8. Admit.
9. Admit.
10. Admit, but not a complete statement of relevant facts.
11. Admit, but not a complete statement of relevant facts.
12. Denied.

13. Denied.

14. Denied.

15. Denied.

16. Denied.

17. Admit.

18. Admit.

18. (SIC) Denied.

19. Denied.

20. Denied.

21. Admit as to the unsigned document; otherwise denied.

22. Admit as to the unsigned document; otherwise denied.

23. Admit as to the unsigned document; otherwise denied.

24. Admit as to the unsigned document; otherwise denied.

25. Admit as to the unsigned document; otherwise denied.

26. Denied.

27. Denied.

28. Denied.

29. Denied.

30. Denied.

31. Denied.

32. Denied.

33. Denied.

34. Denied.

35. Denied.

36. Denied.

37. Denied.

38. Denied.

39. Denied.

40. Denied.

41. Denied.

42. Denied.

43. Denied.

44. Denied.

45. Denied.

46. Denied.

47. Denied.

48. Denied.

49. Denied.

50. Denied.

51. Denied.

52. Denied.

53. Denied.

54. Denied.

55. Denied.

56. Denied.

57. Admit.

58. Denied.

59. No knowledge; therefore denied.

60. No knowledge; therefore denied.

61. No knowledge; therefore denied.

62. No knowledge; therefore denied.

63. No knowledge; therefore denied.

64. No knowledge; therefore denied.

65. Denied.

66. Denied.

67. Denied.

68. Denied

69. Denied.

70. Denied.

71. Denied.

72. Denied.

73. Denied.

74. Denied.

75. Denied.

76. Denied.

77. Denied.

78. Denied.

79. Denied.

80. Denied.

81. Denied.

82. Denied.

83. Admit.

84. Denied.

85. Admit.

86. Admit.

87. Denied.

88. Denied.

89. Admit.

90. Repeat.

91. Denied.

92. Denied.

93. Denied.

94. Denied.

95. Repeat.

96. Denied.

97. Denied.

98. Denied.

99. Denied.

100. Denied.

101. Denied.

102. Denied.

103. Denied.

104. Denied.

105. Denied.

106. Denied.

107. Denied.

108. Repeat.

109. Denied.

110. Denied.

111. Denied.

112. Denied.

113. Denied.

114. Denied.

115. Denied.

116. Denied.

117. Repeat.

118. Denied.

119. Denied.

120. Denied.

121. Denied.

122. Denied.

123. Denied.

124. Repeat.

125. Denied.

126. Denied.

127. Denied.

128. Repeat.

129. Denied.

130. Denied.

131. Denied.

132. Denied.

133. No response.

134. Denied.

## AFFIRMATIVE DEFENSES

### Prior Breach

Seventh Chakra breached the terms of any agreement prior to any alleged breach by Alesse, as factually set forth in the counterclaim.

### Alesse Was Not an Employee for hire

At no time was Alesse an employee for hire under the mandates of *CCNY v Reid*, 490 US 730 (U.S. 1989), in that Alesse was not paid nor treated as an employee under the notions of

6

employer/employee law.

### No Transfer of Copyright

At no time did Alesse execute a written document transferring her interest in the copyright as mandated by Section 204 of the Copyright Act.

### Law of Collaboration

At all times, Alesse acted as a collaborator in the creation of any and all copyrights as set forth in the Counterclaim and as a collaborator, Plaintiff's claims to the contrary must fail.

WHEREFORE having answered the Complaint, Defendant, Francesca Alesse demands judgment in her favor plus an award of costs and attorneys' fees pursuant to 17 USC §505.

### AMENDED COUNTERCLAIM

Counter-Plaintiff, Francesca Alesse ("Alesse"), files this Counterclaim against Counter-Defendant, Seventh Chakra Films ("Seventh Chakra"), and states as follows:

### INTRODUCTION

Counter-Plaintiff worked as a collaborator of Defendant to create the documentary film, "The Act" (hereinafter called the "Film"). At all times relevant, Seventh Chakra was the alter ego of Andrew Wakefield. As such, she brings this action against Plaintiff/Counter-Defendant for accounting for 50% of all proceeds generated from the Film, and breach of oral agreement, declaratory relief (that she is a co-owner of the copyright to the film) and unjust enrichment, and as grounds therefore, alleges as follows:

### PARTIES, JURISDICTION AND VENUE

1. Counter-Plaintiff, Alesse, is a resident of Miami-Dade County, Florida, who is over the age of 18 and otherwise *sur juris*.

2. Counter-Defendant, Seventh Chakra Films, LLC, is upon information and belief a corporation organized in the State of Texas.

7

3.  This is an action for accounting for 50% of all proceeds generated from the Film, breach of oral agreement, unjust enrichment and for declaratory relief.

4.  Venue is proper in that most of the actions that occurred in this case took place in Miami, Florida.

## GENERAL ALLEGATIONS

5.  In 2017, amidst rising political movements and civil unrest in Italy, Andrew Wakefield ("Wakefield"), acting as the agent for Counter-Defendant, Seventh Chakra Films reached out to Counter-Plaintiff, Alesse, because he considered her to be "the expert when it comes to Italy," to work with her as his partner and collaborator to create a documentary film. Wakefield persuaded Alesse to go to Italy, research who were the most important people to interview and to follow several protests and newsworthy events that were happening in the country. In her role, Alesse regularly conducted research on the most prominent figures within the various cities and regions in Italy. Alesse would contact them and set up interviews (this included research, organizing travel, shooting, recording audio, selecting the proper questions, capturing and storing the footage, etc.).

6.  At the time, Alesse was living in New York City and Wakefield was living in Los Angeles. In order to complete the Film, the work was divided among Wakefield (at all times acting for Counter-Defendant) and Alesse. Alesse acted as the director of photography, producer, editor, travel organizer, tech expert and translator, creating original copyright able material. That is encumbered in the film, at all times working as a collaborator and Joint Author with Counter Defendant Once Wakefield would inform Alesse of the location and time of an interview, she would book the flights, hotels, car rentals, and handle all other logistics. Prior to the interviews Alesse would create the subject matter, questions consistent with her contributions to the script. Alesse would often choose the location of the shoot, the type of lens, the lighting, and the overall

style and mood of the interviews, all factors that were later added to the script. During some interviews, Alesse would ask the questions and add her comments, additional questions, shoot the interview operating with two cameras simultaneously, and record the audio. Other times, Alesse conducted the interviews entirely on her own. In fact, in 2018, Alesse went back to Italy by herself to film a series of interviews with various lawyers and politicians.

7. The script for the Film that Counter-Defendant, Seventh Chakra produced was essentially a collage of sound bites from all of the interviews that Alesse had scripted, created and conducted and shot (by her) and thus, her copyrighted original material created as part of Alesse's collaboration agreement with Seventh Chakra. As the actual director of photographer, Alesse is the author of the filmed material (as that term is recognized in the copyright act).

8. In early 2018, Wakefield intended to move to Miami to be close to his new girlfriend. In order to properly produce and edit the Film, Alesse had no choice but to leave her job at ABC News in NYC, where she was making about $10,000 per month and her rent controlled apartment in Manhattan. Alesse hired a real estate agent, picked an apartment in Brickell, and moved to Miami on July 1, 2018. Both Alesse and Wakefield moved to Miami and lived in the same apartment, using the living room of their 2 bedrooms apartment as the editing studio for the movie.

9. In December 2018, Wakefield told Alesse that he/Seventh Chakra lacked the necessary funds to finish creating the Film and that they could not pay Alesse an agreed upon payment. Without any hesitation, Alesse used her own savings to carry on with the production of the Film. During this period, Alesse continued working on the Film in a part-time capacity and without pay, as part of her oral agreement to collaborate with Counter-Defendant, Seventh Chakra and Wakefield. In March 2019, under the guidance of his spiritual advisors Wakefield moved out of the Brickell apartment and rented a small and yet very costly and exclusive 1 bedroom apartment

in Coconut Grove. His room in the Brickell apartment became the editing / production studio.

10. In June 2019, Wakefield informed Alesse that he had received more funds and they continued working in a collaborative manner on the Film now, full time. Soon thereafter, Wakefield gave Alesse a 175-page screenplay consisting (in part) of Alesse's interviews, and he asked her to edit together the entire Film as part of their agreement to collaborate together in the creation of the Film. Throughout the editing process, Alesse would regularly propose solutions, editing techniques, various film styles, various effects, narrative styles, etc., and to add further copyrightable elements that she created as part of their agreement to collaborate. At all times relevant, Alesse worked on the film as an independent contractor and not as an employee. The work flow they had was that Wakefield wrote the script, would submit to Alesse to read it and edit it. Alesse in the editing room would make changes to the script and Wakefield would type those changes and include them in the script. It needs to be noted that in general the shooting and editing processes of a fictional movie follow a script that has been composed at an earlier time. When it comes to documentaries the process is very often inverted. The script is a "guideline" that is modified according to the elements that are filmed and the way the material is edited, the final script of a documentary is derived from the shooting and the editing, in fact is finalized after the whole documentary is fully edited.

11. Alesse insisted that the screenplay was missing a central thread that would keep the story together, (and Wakefield agreed) that it was "only a succession of talking heads, only interviews." Alesse gave Wakefield several copyrightable ideas regarding content in the script that would keep the narrative of the Film together. In order to illustrate her vision Alesse one evening made Wakefield watch a documentary on Netflix titled : "Who Shot the Sheriff", a documentary that uses original images, reenactments, and fictional scenes. Subsequently, the pair conceived the idea of having a fictional couple bearing a child as the central thread for the narrative of the Film.

12. The Film is structured in a way that marries two styles: part of it is a documentary (real people interviews, footage of several live actions on location). Other segments are a fictional movie (actors playing the parts of two parents). This style is what makes the essence of the script

which was created as part of Alesse's collaboration with Counter-Defendant. Wakefield told Alesse that he had raised enough funds to shoot the fictional part of the Film in California, near LA. Los Angel was chosen in order to have the shoot filmed by a renowned Hollywood cinematographer, Sam Painter, who had offered to dramatically reduce his pay if hired for this project. Wakefield and Lori Gregory Martin were looking for a home in LA or Manhattan Beach, when Alesse had the idea to shoot the fictional part at the Rossio's home, where they group had filmed before. Wakefield asked Alesse to contact the Jocelyn Rossio and ask if they could use her house for the shoot and if they could stay overnight instead of going to a hotel. On July 1st 2019 Jocelyn replied that the she and her husband agreed. On October 4-13, 2019, in Topanga Canyon, CA the shooting of the fictional part of the Film took place. As production of the fictional part of the Film was about to get started, Alesse pleaded with Wakefield to read the screenplay as a unit, but Wakefield refused on several occasions. Alesse, finally, read it and relayed her notes for adding further copyrightable elements to Wakefield as part of their agreement to collaborate to complete the Film. At that point the screenplay consisted of 186 pages, 77 scenes, of which 64 were set in the kitchen. When Alesse saw that she knew she had to change it, it was absolutely non-cinematic. Wakefield asked Alesse to draw the storyboards for the scenes, which she did on her own, as part of her agreement to collaborate in the completion of the Film. Once at Topanga, Alesse acted on her revisions by redoing all of the storyboards, she changed the location of the 64 scenes Wakefield initially wrote that the film would take place in the kitchen and she storyboarded and directed the crew and the actors to shoot in different rooms and spaces in and outside the house (from the living room to the cinema room to the garden etc.) Since Alesse changed the setting of most of the scenes she also had to change the actor's actions, at times wardrobe, and dialogue. In doing so, Alesse rewrote the whole screenplay of the movie in one day completing the Film. After all scenes where shot Wakefield typed Alesses's changes into the script. So much so that the final screenplay and

the final cut of the Film reflects all the changes made by Alesse. Those changes consist in settings, locations, dialogue, actions of actors, wardrobe, lighting, camera angles, etc. Furthermore, during production, Alesse was the one to discuss lighting and camera movements with the camera crew.

13. On Sunday, December 29th, Wakefield contacted Alesse via email writing:

> *"I have spent the last month struggling to work out the way forward for a film on which we have both worked hard for some years……The early part of this year was to have included fundraising for the movie's budget and this would have been helped greatly by having a cut of the movie to show investors. I do not have this cut and so fundraising is inevitably compromised. The movie is going to struggle to a conclusion, but it will get there. Whether or not it will be delayed remains to be seen. While you declined to sign a contract or you considered that a contract was unnecessary, in The Act you will receive a producer credit and a credit as DP…"*

14. This assertion was false. Alesse asked Wakefield for a written contract several times throughout the duration of their business relationship to confirm the terms of their oral agreement to collaborate together to create the Film. To clarify their business relationship, Alesse took it upon herself to draft a contract and present it to Wakefield while the two were in Salt Lake City, UT; however, Wakefield refused to sign it. The main reason why he refused to sign it was that she indicated that in case she was not to finish the movie all the way to international distribution, Wakefield was to pay her 6 months of salary. To which he replied: "Francesca, really?" The reason was that she had left her job in NYC to move to finish the whole movie, in other words she thought she was going to work in Miami for 2 years or more. Weeks later, Alesse re-wrote the contract and the two went back and forth for months on revision without ever reaching an agreement on a written contract. Nevertheless, Alesse and Wakefield continued to operate together pursuant to the oral agreement to collaborate on the Film.

15. Pursuant to the Oral Agreement, Alesse lost $12,000 from renting studio space for Seventh Chakra.

16. Alesse also gave up her job with ABC News in New York City based upon her reliance in good faith on the term of the oral agreement with Counter-Defendant, Seventh Chakra that she would receive compensation paid until the completion of the Film, including post-production, international distribution, and a world tour. She also left her rent controlled apartment in NYC.

17. Alesse and Wakefield, acting for Seventh Chakra reached an oral agreement that Alesse would collaborate with Wakefield in the creation of the Film and as compensation therefore, Alesse would receive a monthly advance in the amount of $7000 towards 50% of the net (gross revenues less direct costs) proceeds derived from the exploitation of the Film.

18. On February 20, 2020, Alesse filed a copyright registration for the motion picture, PAU004022925, in her name and Andrew Wakefield. See attached hereto as Exhibit A.

19. On May 11, 2020, Wakefield filed a copyright registration, changing the title of the Film from "The Act," to "1986 The Act" attempting to register the screenplay to the Film in his name. See No. PAU00402880 attached hereto as Exhibit B.

20. On August 28, 2020, Counter-Defendant filed a copyright of the Film under the new name "1986 The Act" as "Employer for Hire," No. PAU0002264550 attached hereto as Exhibit C.

## COUNT I – BREACH OF ORAL CONTRACT

21. Alesse re-alleges and re-avers the allegations of paragraphs 1 through 20 above as if set forth herein.

22. The Parties reached the following agreement: Starting in 2017 Alesse, would move to Miami where she would: work as Wakefield's collaborator to contribute original copyrightable matter, including but not limited to settings dialogue and direction and incorporate same into the script, she would conduct and film certain interviews and

13

travel to Italy to film necessary B Roll (as the term is commonly understood in the Film industry) and consistent with the script and collaborate with Counter-Defendant as a partner in the creation and development of the script and Film and would serve as the Director of Photography (as that Term is commonly understood in the Film industry) and then she would fully edit the 1st version of the Film until the first edit was complete and in return she would receive: A) reimbursement of her out of pocket costs, B) 50% of the profits of the film and C) $7000 a month for her services from early 2018 until the 1st version of the Film was edited and D) credit in the credits of Film as the Director of Photography and as producer (the "Oral Agreement").

23. Pursuant to the Oral Agreement, Alesse worked as an independent contractor on the Film. In this role, Alesse performed producer services, acted as field producer, was the director of photography, camera operator, sound operator and co-director of the Film, social media manager and she was the initial Editor. As such, she added original copyrightable elements to the Film, as the collaborator and pursuant to the terms of the Oral Agreement.

24. Alesse fully and completely performed her obligations under the terms of the Oral Agreement which was fully completed by December 2019, as more fully described in Paragraphs 6, 7, 10-12 above, in which Alesse delivered her edited version of the Film.

25. Counter-Defendant, Seventh Chakra breached its' obligations under the terms of the Oral Agreement by: A) not reimbursing her for her out of pocket costs, B) not paying the $7000/ month payment for all the months she worked and, C) by not paying her 50% of the profits of the Film. Pursuant to the law of collaboration among Joint Authors, as recognized in *Korman v Iglesias*, 736 F. Supp 261 (So. Dist. Fla 1990) and it's progency Defendant owes Alesse an accounting for her share of the proceed of the Film and as a proximate result, Alesse has been damaged.

26. Alesse has fulfilled all conditions precedent prior to filing suit.

WHEREFORE for the reasons set forth herein, Alesse respectfully requests this Honorable Court to enter a judgment against Counter-Defendant, Seventh Chakra for 50% of the net proceeds derived from the Film the out-of-pocket costs and the payments of the $7000 per month (which was not paid) plus accrued interest to date and for any such other relief this Court deems just and appropriate.

## COUNT II – ACCOUNTING FOR 50% OF NET PROCEEDS FROM THE FILM

27. Alesse re-alleges and re-avers the allegations of paragraphs 1 through 20 above as if set forth herein.

28. Pursuant to the terms of the Oral Agreement, Counter-Defendant, Seventh Chakra agreed to pay Alesse 50% of the net proceeds derived from the Film.

29. The calculation of Alesse's share of the proceeds from the Film as recognized is due to her as a Joint Author involves an extensive, complicated accounting, which is pled in the alternative to the legal claims in Count I. Pursuant to the law of collaboration among Joint Authors, as recognized in *Korman v Iglesias*, 736 F. Supp 261 (So. Dist. Fla 1990) and it's progency, Defendant owes Alesse an accounting for her share of the proceed of the Film

WHEREFORE for the reasons set forth herein, Alesse respectfully requests this Honorable Court to order Counter-Defendant, Seventh Chakra to account to Alesse and to enter a judgment granting her 50% of the net proceeds generated from the Film; and for any such other relief this Court deems just and appropriate.

## COUNT III – DECLARATORY RELIEF

30. Alesse re-alleges and re-avers the allegations of paragraphs 1 through 20 above as if set forth herein.

31. There is a bona fide, actual, present, and practical need for a declaration that Alesse is a co-owner of the Film, co-author and thus, co-owner of the copyright and has legal title over 50% of the rights in it.

32. Alesse was hired as an independent contractor to work on the Film and not as an employee. In this role, Alesse performed producer services, acted as field producer, was director of photography, camera operator, sound director and co-director, setting her own work schedule, using her own equipment and working from her premises. As such, she contributed original copyrightable elements to the film as the collaborator of Counter-Defendant, Seventh Chakra.

33. At no point was Alesse ever an employee of Counter-Defendant, Seventh Chakra. She worked under her own creative control by herself out of her own apartment, using her own materials. She was never paid a regular salary by Counter-Defendant, Seventh Chakra, nor was she ever provided any standard employee benefits such as health care or retirement plans.

34. Additionally, no written agreement exists which would have deemed Alesse's contributions to the Film as a work made for hire.

WHEREFORE for the reasons set forth herein, Alesse respectfully requests this Honorable Court to enter a judgment declaring her to be co-owner of the Film, co-author and thus, co-owner of the copyright consistent with the copyright registration attached as Ex A; and for any such other relief this Court deems just and appropriate.

## COUNT IV – UNJUST ENRICHMENT

35. Alesse re-alleges and re-avers the allegations of paragraphs 1 through 20 above as if set forth herein.

36. Seventh Chakra asked Alesse to perform certain services and in return, it paid a monthly payment of $7000 towards Alesse's 50% share of net profits.

37. For a time, Seventh Chakra paid Alesse the $7000 monthly payment.

38. For a time, Seventh Chakra paid Alesse only a portion of the monthly advance.

39. Seventh Chakra did not pay Alesse her complete payment for all the months that she worked.

40. Seventh Chakra stated to Alesse that it did not have the money and could not pay the monthly advance; however, it reassured Alesse that if she continued to work on the Film, it would pay such amounts to Alesse.

41. Based thereupon these promises, Alesse continued to work on the Film.

42. Seventh Chakra accepted the services provided by Alesse and received a benefit therefrom. Wakefield and Seventh Chakra make million of dollars by having people and millionaires donate to his non-profit. Wakefield then uses those donations to fund his projects and to support his lavish lifestyle. Alesse's work on the film, plus her work on social media platforms and other means of advertisement, including contacting people directly and during public events has made more donations flow into Wakefield's accounts.

43. It would be inequitable for Seventh Chakra to accept the benefits of Alesse's services without having to pay for same.

WHEREFORE for the reasons set forth herein, Alesse asks this Court to enter judgment against Seventh Chakra equal to the monthly fees (or part) which are owed to Alesse, plus interest calculated thereon.

Respectfully submitted,

**WOLFE LAW MIAMI, P.A.**
*Counsel for Defendant/Counter-*
 *Plaintiff Francesca Alesse*
Latitude One Building
175 SW 7th Street, Suite 2410
Miami, Florida 33131
Telephone: 305-384-7370

Facsimile: 305-384-7371

By: /s/Richard C. Wolfe
RICHARD C. WOLFE
Florida Bar No. 355607

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY, that a true and correct copy of the forgoing was furnished, via electronic mail, on this 2nd day of August, 2021, upon following:

Alan Fertel, Esq.
WEISS SEROTA HELFMAN
COLE & BIERMAN, P.L.
*Attorneys for Defendant, Andrew Wakefield*
2525 Ponce de Leon Boulevard, Suite 700
Coral Gables, Florida 33134